UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE GAP, INC., a Delaware corporation,<br><br><div align="center">Plaintiff,</div><br>v.<br><br>BROOKLINE INVESTMENT LLC, a<br>Massachusetts limited liability company,<br><br><div align="center">Defendant.</div> | Civil Action No.<br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff The Gap, Inc. ("Gap" or "Tenant"), by and through counsel, brings this complaint against Brookline Investment LLC ("Brookline" or "Landlord") and states as follows:

## NATURE OF THE CLAIMS

1.      Gap leases and operates a retail apparel and clothing commercial space at 306 Harvard Street in Coolidge Corner, Brookline, Massachusetts (the "Premises"). Gap brings this action to vindicate its rights under its Lease (defined below) with Brookline. Among other things, Gap seeks to stop Brookline's unlawful efforts to terminate the Lease and collect rent and other expenses that are not owed by Gap.

2.      The COVID-19 pandemic has presented unique and unprecedented circumstances that were unforeseeable—indeed, unimaginable—even just a few months ago. The disease is highly contagious and its spread has been rapid. The government's reaction was profound and has prevented the Gap store at issue in this action from opening its doors for months. To protect the health and safety of its employees, customers, and the surrounding community, and to comply with applicable law, Gap was required to close its store on March 24, 2020 and to keep it closed until June 8, 2020. Like innumerable other companies, Gap was required to make the difficult decision to furlough this store's employees – and tens of thousands more for closed stores across the country

<div align="center">1</div>

– to preserve its finances while revenue at this location dropped to zero overnight. Even now, as government restrictions begin to ease for some activities and types of businesses but not others, the disease remains virulent. The recommended guidelines for operations may provide some measure of protection, but will radically change the shopping experience for consumers and retailers in the future. Even now, as the disease curves around the country evolve with each incremental phase of reopening, and social distancing guidelines are ignored by many, governments and industry experts have predicted one or more next waves of infection will occur. Indeed, shopping for apparel in physical stores will look nothing like what was contemplated by the Lease when it was executed. In a world of unforeseeable events, the circumstances the store has faced are at the extreme end of unforeseeability.

3.      These circumstances not only imposed severe and irreparable hardship on Gap, they frustrated the express purpose of the Lease and made the principal object of the Lease illegal, impossible, and impracticable. Thus, the subject Lease and applicable law nullified any obligation to pay rent from, at a minimum, mid-March through June 8, 2020, with future rent also potentially subject to such nullification, and entitle Gap to a refund of rent or expenses it paid in advance for March 2020 and requires that the Lease be modified as a matter of law.

4.      Accordingly, Gap brings this action to seek a determination of its rights and obligations under the subject Lease, including a determination that it owes no additional money to Landlord, that Landlord owes money to Gap, that Gap is entitled to reformation of the Lease, and that Gap is entitled to attorney's fees and expenses incurred in connection with this action.

## PARTIES

5.      Plaintiff Gap is a Delaware corporation with its principal place of business in San Francisco, California.

6.      Defendant Brookline is a Massachusetts limited liability company. On information and belief, its sole member is Brookline Investment Reality Corp., a Massachusetts corporation with its principal place of business located at One Washington Street, Wellesley, Massachusetts.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332(a) because the matter in controversy exceeds the sum of $75,000, exclusive of interest, and is between citizens of different States.

8.      Venue is proper in this judicial district pursuant to 28  U.S.C. § 1391 because it is a judicial district in which a substantial part of the events giving rise to the claims asserted herein occurred and Landlord is subject to personal jurisdiction in this district as of the time the action was commenced.

## FACTS

9.      On or about October 30, 2000, Landlord's predecessor-in-interest, Brookline Investment Limited Partnership, and Gap's predecessor-in-interest, The Fisher Gap Stores, Inc., entered into a lease for the Premises (as amended and modified by that certain First Amendment to Lease dated June 8, 2012, the "Lease").

10.     The parties' mutual and express purpose in entering into the Lease was to provide Tenant with commercial retail space suitable for the operation of a retail apparel store. For example, Article 12.1 of the Lease defines the Permitted Use of the Premises as follows:

> [T]he Premises may be used for any lawful retail purpose (the 'Permitted Use'). Landlord shall take no action which would impair or limit Tenant's ability to conduct the Permitted Use. Landlord acknowledges that Tenant is entering into this Lease in reliance upon its ability to conduct the Permitted Use without any limitation or restriction whatsoever by reason of any exclusive provision or contractual restriction or limitation granted to any other party whatsoever and wherever located, which applies or pertains to the Premises or Tenant's use therein.

11.     Further, the Lease evidences the parties' mutual intent that Tenant would have no obligation to pay rent in the event that unforeseen circumstances prevent Tenant from operating at the Premises. Article 18.5 of the Lease provides that, if the shopping center, including the Premises, is damaged or destroyed, "Tenant shall be entitled to a proportionate reduction of Rent from the date of the initial damage or destruction until the repairs or restoration work by Landlord

3

and Tenant are complete, such proportionate reduction to be based upon the extent to which such damage or destruction and the making of such repairs or restoration shall interfere with the use conducted by Tenant in the Premises. If from the standpoint of prudent business management the Premises cannot be operated at all during the repair or restoration work, then Rent shall totally abate from the date of the initial damage or destruction (or date of closure of the Premises, if later) unless the repairs or restoration work by Landlord and Tenant are complete…."

12.    But for the ability to operate a retail store at the Premises, Tenant would not have entered into the Lease, and Tenant's ability to operate retail stores at the Premises was the sole consideration Tenant received in exchange for entering into the Lease, all other nominal benefits of the Lease being a part of, and subordinate and ancillary to, that consideration. Without the ability to operate a store at the Premises, the transaction reflected by the Lease makes no sense.

13.    For example, the Lease is for a fixed term. At the time of contracting, Tenant and the original landlord under the Lease negotiated an exchange of rent and other consideration that Tenant would pay based on the contemplated term of the Lease. Among other things, if the parties had known at the time they negotiated and entered the Lease that Tenant would not be permitted to operate a retail store for the entire duration of the Lease, and that they would be required to be closed for a period of months, the parties would not have agreed on the same amount of rent and other consideration.

14.    From the inception of the Lease until March 19, 2020, Tenant maintained and operated a retail apparel store at the Premises pursuant to the Lease.

15.    On March 10, 2020, Governor Charlie Baker proclaimed a State of Emergency to exist in Massachusetts as a result of the threat of COVID-19.

16.    On March 23, 2020, Governor Baker issued COVID-19 Order No. 13, ordering the closure of all businesses that do not provide COVID-19 Essential Services starting at noon on March 24, 2020 until April 7, 2020. Retail shopping stores and centers, such as that operated by Gap at the Premises, are not considered COVID-19 Essential Services.

61683173.1

17.     On March 31, 2020, Governor Baker issued COVID-19 Order No. 21, extending the shutdown order of non-essential businesses until May 4, 2020.

18.     On April 28, 2020, Governor Baker issued COVID-19 Order No. 30, extending the shutdown order of non-essential businesses until May 18, 2020.

19.     On May 15, 2020, Governor Baker issued COVID-19 Order No. 32, extending the shutdown order of non-essential businesses until May 19, 2020.

20.     On May 18, 2020 Governor Baker issued the "Reopening Massachusetts" Plan which allowed a phased reopening of certain businesses in Massachusetts. Under this plan, Gap was not allowed to reopen the Premises until June 8, 2020. On this date, Gap was allowed to re-open with certain protocols, protections and restrictions in place, but with a reduced customer capacity.

21.     Due to the devastating impact of COVID-19, Tenant had no alternative but to suspend all retail operations at the Premises on March 19, 2020 to comply with applicable governmental orders and guidelines and to protect the health and safety of its employees, customers, and the surrounding community. Between March 19, 2020 and June 8, 2020, Tenant was not able to resume normal operations at the Premises.

22.     As a result of the foregoing circumstances and orders, and other applicable governmental orders and guidelines, all of which were unforeseeable at the time the Lease was entered into, and which resulted from no act of either party, the parties' intended use of the Premises was frustrated, became impossible, illegal, and impracticable. Specifically, Tenant was forced to suspend all retail operations at the Premises. Tenant's purpose in entering into the Lease was frustrated. Tenant's performance under the Lease became impossible and impracticable. And Tenant was deprived of the consideration it received in exchange for entering into the Lease.

23.     Indeed, although the Lease specifically contemplated that Tenant would benefit from its use for a fixed term, as a result of the unforeseeable COVID-19 crisis, Tenant has been deprived of its use of the Premise for the full term that Tenant was promised under the Lease. Such a result is inequitable and damages Tenant, in part because the term of the Lease, and the

5

expectation that Tenant would be able to use the Premises for the entire term, were the basis for the parties' negotiations and calculations at the time of contracting concerning Tenant's obligation to pay rent and other consideration under the Lease. Thus, for the additional fact and reason that the Premises were not usable for the entire term of the Lease, it is impossible and impracticable for the parties to continue performing their obligations under the Lease, the parties' mutual purpose for entering into the Lease has been frustrated, and the consideration Tenant was to receive under the Lease has failed.

24.     None of these events were foreseeable at the time the Lease was executed. Indeed, this is the first time in history that all 50 U.S. states are under a federal major disaster declaration at the same time.

25.     And this crisis is far from over. Even after restrictions limiting operations at the Premises are lifted, the conditions under which retailers are expected to operate, and the environment in which they will have to operate, is nothing like what was contemplated and promised at the time the Lease was executed. Tenant was promised retail space in a vibrant shopping center that would be attractive to consumers. However, retailers are now expected to downgrade services in the interest of health and safety, and most consumers are still too concerned about the risk of entering a store to return to the shopping centers *en masse*. Nevertheless, Landlord has wrongfully demanded that Tenant pay rent for the period of time that Tenant was forced to close and has threatened Tenant with dispossession.

26.     On April 16, 2020, in the midst of a global pandemic and at a time when there was far less clarity over how COVID-19 would spread and affect the country and economy, Landlord sent a notice letter advising Tenant that it had "failed to pay Minimum Rent and other amounts due under the Lease" on April 1, 2020. Landlord advised Tenant that it had ten days to pay or face legal action.

27.     Following receipt of the letter, Tenant sent two payments to Landlord in the amounts of $12,753.12 and $9,777.40. These payments were made under protest and duress, and without waiving any of Tenant's rights under the Lease and applicable law.

6

28.     On July 10, 2020, Landlord sent a letter to Tenant, acknowledging receipt of these two payments and advising that it would accept such funds as partial payment of rent due under the Lease.

29.     Notwithstanding its acceptance of the foregoing payments, on August 12, 2020, Landlord sent another letter to Tenant purporting to terminate the Lease and demanding that Tenant deliver the Premises on or before August 31, 2020.

30.     Despite Tenant's efforts to resolve this dispute amicably, Landlord has continued to assert that the Lease is terminated and that Tenant owes holdover rent under the Lease plus other expenses.

31.     Because the parties cannot agree on their rights and obligations under the Lease, Tenant brings the following claims for breach of contract, declaratory relief, other legal and equitable relief, and attorney's fees and costs.

## CAUSES OF ACTION

## COUNT I – BREACH OF CONTRACT

32.     Tenant repeats, realleges, and incorporates all prior paragraphs above as if fully set forth herein.

33.     The Lease constitutes a binding enforceable contract.

34.     Landlord breached the Lease with Tenant by, without limitation:

   a.     demanding Tenant pay rent and other expenses that were not owed under the Lease;

   b.     demanding, collecting and subsequently failing to reimburse Tenant for rent and excess charges paid under the Lease before the COVID-19 crisis;

   c.     later failing to reimburse Tenant for the prorated amount of the rent, charges and other expenses attributable to the period that Tenant has been deprived of its uses of the Premises;

   d.     serving purported default notices and demands to quit the Premises in violation of the Tenant's rights; and

7

e.    taking such other actions as are inconsistent with Tenant's rights under the Lease and applicable law.

35.    Landlord has further breached the Lease by demanding Tenant pay rent for the time that it was deprived of its right to operate retail stores at the Premises, in violation of the express terms of the Lease.

36.    Tenant has performed all of its obligations under the Lease except those that were waived, excused, frustrated or rendered impossible and/or impracticable.

37.    As a direct and proximate result of Landlord's breaches of contract, Tenant suffered the damages alleged herein.

38.    Tenant is entitled to a judgment against Landlord in an amount to be proven at trial.

**COUNT II - DECLARATORY RELIEF**

39.    Tenant repeats, realleges, and incorporates all prior paragraphs above as if fully set forth herein.

40.    Tenant's ability to operate a retail store at the Premises was the express purpose of the Lease.

41.    Tenant's ability to operate a retail store at the Premises was the parties' mutual purpose in entering into the Lease, as the parties understood at the time of contracting, and but for its right to operate such a retail store, Tenant would not have entered into the Lease. Indeed, without Tenant's ability to use the Premises, the transactions between the parties that resulted in the Lease make no sense. When Tenant was forced to suspend all retail operations at the Premises, the purpose of the Lease was frustrated and impossible to effectuate due to no fault of Tenant, the Lease's object and purpose became impossible and impracticable, and Tenant was deprived of the consideration it received in exchange for entering into the Lease.

42.    Although necessary, the sudden suspension of retail operations at the Premises was unforeseeable and not contemplated by the parties at the time the Lease was executed.

43.     An actual controversy exists between Tenant and Landlord concerning Tenant's rights and obligations under the Lease, and Tenant has no adequate remedy at law. Specifically, the parties dispute:

a.     Whether Tenant had an obligation to pay rent and expenses under the Lease from and after March 19;

b.     Whether there was a frustration of purpose of the Lease;

c.     Whether the continued operation of the Lease was illegal, impossible, or impracticable;

d.     Whether there was a failure of consideration under the Lease; and

e.     Whether the notices to cure default and purported termination notices under the Lease were valid.

44.     The parties further dispute the effects of the foregoing on the continuing obligations, if any, of the parties.

45.     Therefore, Tenant seeks a judgment declaring the following:

a.     That the rent and expenses under the Lease is abated from and after March 19, 2020;

b.     That there was a frustration of purpose of the Lease;

c.     That the continued operation of the Lease was illegal, impossible, or impracticable;

d.     That there was a failure of consideration under the Lease; and

e.     That the purported notices to cure default and termination notice were ineffective and of no legal consequence, including because Tenant was not in default under the Lease.

## COUNT III – REFORMATION OF LEASE

46.     Tenant repeats, realleges, and incorporates all prior paragraphs above as if fully set forth herein.

47.     Tenant's ability to operate a retail store at the Premises was the parties' mutual purpose in entering into the Lease, as both Tenant and the original landlord under the Lease understood at the time of contracting, and but for its right to operate such a retail stores Tenant would not have entered into the Lease. Indeed, without Tenant's ability to use the Premises for a retail store, the transactions between the parties that resulted in the Lease make no sense.

48.     When Tenant was forced to suspend all retail operations at the Premises, the purpose of the Lease was frustrated and impossible to effectuate due to no fault of Tenant, the Lease's object and purpose became impossible and impracticable, and Tenant was deprived of the consideration it received in exchange for entering into the Lease.

49.     This sudden suspension of retail operations at the Premises was unforeseeable and not contemplated by the parties at the time the Lease was executed.

50.     The parties would not have entered into the Lease had they known that Tenant would have been unable to operate a retail apparel store at the Premises, and Tenant's ability to use the Premises as a retail apparel store was the sole consideration Tenant received under the Lease.

51.     It was the parties' true intent that Tenant would not pay rent or other consideration for the Premises if such use was rendered impossible or impracticable. Had the parties been able to foresee the events of the COVID-19 crisis at the time of contracting, the parties would have provided language stating their true intent expressly. This mutual mistake relates to an essential element of the Lease and warrants reformation of the Lease.

52.     An actual controversy exists between Tenant and Landlord concerning Tenant's rights and obligations under the Lease, and Tenant has no adequate remedy at law.

53.     Tenant is entitled to judicial reformation of the Lease to reflect the parties' true intent that Tenant would have no obligation to pay rent once it was deprived of the use of the Premises or that the amount of rent for the Term would have otherwise been adjusted to account for the portion of the Lease's Term during which Tenant could not operate retail stores in the Premises.

**COUNT IV – UNJUST ENRICHMENT AND MONEY HAD AND RECEIVED**

54.     Tenant repeats, realleges, and incorporates all prior paragraphs above as if fully set forth herein.

55.     Tenant's ability to operate a retail store at the Premises was the parties' mutual purpose in entering into the Lease, as all parties understood at the time of contracting, and but for their rights to operate such a retail store, Tenant would not have entered into the Lease. Indeed, without Tenant's ability to use the Premises, the transactions between the parties that resulted in the Lease make no sense.

56.     When Tenant was forced to suspend all retail operations at the Premises, the purpose of the Lease was frustrated and impossible to effectuate due to no fault of Tenant, the Lease's object and purpose became impossible and impracticable, and Tenant was deprived of the consideration it received in exchange for entering into the Lease.

57.     This sudden suspension of retail operations at the Premises was unforeseeable and not contemplated by the parties at the time the Lease was executed.

58.     The parties would not have entered into the Lease had they known that Tenant would have been unable to operate a retail apparel store at the Premises, and Tenant's ability to use the Premises as a retail store was the sole consideration it received under the Lease.

59.     Tenant has previously paid rent and other consideration to Landlord, in an amount to be proven at trial, for a period of time that Tenant was unable to operate retail stores at the Premises. Tenant also previously paid rent and consideration to Landlord as a result of Landlord's other demands that were greater than the amount Tenant owed under the Lease. Tenant made such payments without knowledge of the facts, under protest and under duress.

60.     Upon information and belief, Landlord is holding the excess payments previously paid by Tenant under the Lease.

61.     Landlord benefited from these payments to Tenant's detriment.

62.     Landlord should not be allowed to retain the rent and other consideration paid for the period of time that Tenant was unable to operate a retail store at the Premises as originally

contemplated by the Lease. Retention of these funds and benefits by Landlord is inequitable under the circumstances.

63.     Tenant is entitled to restitution in its favor equal to the sums that Tenant have overpaid as rent and as other consideration to Landlord, in an amount to be proven at trial.

## COUNT V – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

64.     Tenant repeats, realleges, and incorporates all prior paragraphs above as if fully set forth herein.

65.     The Lease constitutes a binding enforceable contract between Tenant and Landlord.

66.     Every contract contains a covenant of good faith and fair dealing between the parties.

67.     Landlord has failed to abide by this covenant because they have injured the rights of Tenant and deprived Tenant of the fruits and benefits of the Lease.

68.     Specifically, Landlord breached the covenant by, without limitation:

  a.    wrongfully demanding Tenant pay rent and other expenses that were not owed under the Lease;

  b.    collecting and subsequently failing to reimburse Tenant for excess rent and charges paid under the Lease before the COVID-19 crisis;

  c.    failing to reimburse Tenant for the prorated amount of the rent, charges and other expenses attributable to the period that Tenant has been deprived of its uses of the Premises;

  d.    serving purported default and termination notices and demands to quit the Premises in violation of the Tenant's rights;

  e.    demanding Tenant pay rent for the time that it was deprived of its right to operate a retail store at the Premises, in violation of the express terms of the Lease; and

  f.    taking such other actions as are inconsistent with Tenant's rights under the Lease and applicable law.

69.     As a direct and proximate result of Landlord's breaches, Tenant suffered the damages alleged herein.

70.     Tenant is entitled to a judgment against Landlord in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Tenant respectfully requests that this Court enter judgment:

a.     Awarding damages to Tenant in an amount to be proven at trial for Landlord's breaches of contract.

b.     Declaring that the obligation to pay rent and expenses under the Lease abated from and after March 19, 2020;

c.     Declaring that there was a frustration of purpose of the Lease,

d.     Declaring that the continued operation of the Premises under the Lease was illegal, impossible, or impracticable on and after March 19, 2020;

e.     Declaring that there was a failure of consideration under the Lease;

f.     Declare that Landlord's attempts to terminate the Lease are unlawful and are null, void and of no force or effect.

g.     Making such other and further Declarations as the Court deems just and proper;

h.     Declaring that purported default and termination notices under the Lease were ineffective and of no legal consequence because Tenant was not in default;

i.     Granting equitable reformation of the Lease to reflect the parties' true intent that Tenant would have no obligation to pay rent while it was deprived of the use of the Premises or adjusting the amount of rent and expenses for the portion of the Lease's Term during which Tenant could not operate a retail store in the Premises;

j.     Ordering Landlord to reimburse and give restitution to Tenant for the payment of rent and other expenses wrongly paid by Tenant and withheld by Landlord;

k.     Awarding Tenant its attorney's fees, expenses, interest and other costs in this action to the extent permitted by law;

13

61683173.1

l.      Ordering Landlord to refrain from future violations of the Lease, to cease asserting that the Lease has been terminated and to abide by the terms of the Lease, as reformed, going forward; and

m.      Such other and further relief that this Court may deem just and proper.

## JURY DEMAND

Plaintiff Gap, Inc. hereby demands a trial by jury for all issues so triable.


DATED:  September 4, 2020

PLAINTIFF
THE GAP, INC.

By its attorneys:

ROBINS KAPLAN LLP

By: */s/ Anthony A. Froio*_____
    Anthony A. Froio (BBO# 554708)
    afroio@robinskaplan.com
    Peter N. Foundas (BBO# 681599)
    pfoundas@robinskaplan.com
    ROBINS KAPLAN LLP
    800 Boylston Street, Suite 2500
    Boston, MA 02199
    (617) 267-2300